# 25-1085-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



ALEXANDER BELYA,

*Plaintiff-Appellant,*

*v.*

HILARION KAPRAL, AKA METROPOLITAN HILARION, NICHOLAS OLKHOVSKIY, VICTOR POTAPOV, SERGE LUKIANOV, DAVID STRAUT, ALEXANDRE ANTCHOUTINE, GEORGE TEMIDIS, SERAFIM GAN, BORIS DMITRIEFF, JOHN DOES 1 THROUGH 10, EASTERN AMERICAN DIOCESE OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA, THE SYNOD OF BISHOPS OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA, MARK MANCUSO,

*Defendants-Appellees,*

PAVEL LOUKIANOFF,

*Defendant.*

————————————

*On Appeal from the United States District Court
for the Southern District of New York*

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

Oleg Rivkin
RIVKIN LAW GROUP PLLC
*Attorneys for Plaintiff-Appellant*
48 Wall Street, Suite 1100
New York, New York 10005
212-231-9776



## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

ARGUMENT .......................................................................................... 3

I. The First Amendment does not bar Belya's claims ................................ 3

    A. The ministerial exception does not bar Belya's claims .................................. 4

    B. The ecclesiastical abstention doctrine does not bar Belya's claims .............. 10

    C. The Establishment and Free Exercise Clauses do not bar Belya's claims ................................................................................................. 15

II. The September 3 Letter is not a privileged communication ........................... 22

III. Belya can prove actionable publication ............................................ 25

IV. Belya can prove damages ................................................................ 27

V. The defamatory statement is of and concerning Belya and is not true ............ 28

CONCLUSION ..................................................................................... 30

CERTIFICATE OF COMPLIANCE ................................................... 31

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page**

*A & E Products Group L.P. v. The Accessory Corp.,*
2001 WL 1568238 (S.D.N.Y. 2001) .................................................................29

*Belya v. Kapral,*
45 F.4th 621 (2d Cir. 2022) .............................................................1, 10, 12, 15

*Boyd v. Nationwide Mut. Ins. Co.,*
208 F.3d 406 (2d Cir. 2000) .............................................................................24

*Bryce v. Episcopal Church,*
289 F.3d 648 (10th Cir. 2002) ...................................................................11, 13

*C.L. Westbrook, Jr. v. Penley,*
231 S.W.3d 389 (Tex. 2007)..............................................................................13

*Carroll v. Trump,*
683 F. Supp.3d 302 (S.D.N.Y. 2023)..................................................................27

*Carroll v. Trump*
2024 WL 1786366 (S.D.N.Y., Apr. 25, 2024) ...................................................27

*Chandok v. Klessig,*
632 F.3d 803 (2d Cir. 2011)..............................................................................22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .....................................................................................17, 18

*DeMarco v. Holy Cross High Sch.,*
4 F.3d 166 (2d Cir. 1993) .................................................................................11

*Dermody v. Presbyterian Church (U.S.A.),*
530 S.W.3d 467 (Ky. Ct. App. 2017)..................................................................13

*Drevlow v. Lutheran Church, Mo. Synod,*
991 F.2d 468 (8th Cir. 1993) ............................................................................12

*Elvig v. Calvin Presbyterian Church,*
　375 F.3d 951 (9th Cir. 2004) ............................................................8, 9

*Episcopal Diocese of S. Va. v. Marshall,*
　903 S.E.2d 534 (Va. Ct. App. 2023) ....................................................9

*Fisher v. Forrest,*
　2017 WL 128705 (S.D.N.Y. Jan. 13, 2017)........................................26

*Flamm v. Am. Ass'n of Univ. Women,*
　201 F.3d 144 (2d Cir. 2000) ..............................................................30

*Fratello v. Archdiocese of N.Y.,*
　863 F.3d 190 (2d Cir. 2017) ............................................................5, 6

*Friedlander v. Port Jewish Ctr.,*
　347 F. App'x 654 (2d Cir. 2009) ..........................................................5

*Fulton v. City of Philadelphia,*
　593 U.S. 522 (2021) .....................................................................17, 18

*Gertz v. Robert Welch, Inc.*
　418 U.S. 323 (1974) ...........................................................................18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
　565 U.S. 171 (2012) .............................................................4, 5, 9, 15

*Hutchinson v. Thomas,*
　789 F.2d 392 (6th Cir. 1986) ...............................................................5

*Kavanagh v. Zwilling,*
　997 F. Supp.2d 241 (S.D.N.Y. 2014)............................................13, 16

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
　344 U.S. 94 (1952) .......................................................................10, 11

*Kraft v. Rector, Church Wardens & Vestrymen of Grace Church in New York,*
    2004 WL 540327 (S.D.N.Y. Mar. 17, 2004) ....................................... 5

*Lehman v. Fox Cable Networks Inc.,*
    2009 WL 2707391 (E.D.N.Y., Aug. 25, 2009) ................................... 26

*Martinelli v. Bridgeport Roman Cath. Diocesan Corp.,*
    196 F.3d 409 (2d Cir. 1999) ............................................................. 14

*McCarthy v. Fuller,*
    714 F.3d 971 (7th Cir. 2013) ............................................................. 11

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.,*
    966 F.3d 346 (5th Cir. 2020) ............................................................. 11

*Moon v. Moon,*
    833 F. App'x 876 (2d Cir. 2020) .......................................... 10, 11, 12

*NLRB v. Cath. Bishop,*
    440 U.S. 490 (1979) ........................................................................ 16

*November v. Time,*
    13 N.Y.2d 175, 194 N.E.2d 126 (N.Y. 1963)................................... 30

*Ogle v. Church of God,*
    153 F. App'x 371 (6th Cir. 2005) ....................................................... 5

*Ogle v. Hocker,*
    279 F. App'x 391 (6th Cir. 2008) ..................................................... 11

*Orenstein v. Figel,*
    677 F. Supp.2d 706 (S.D.N.Y. 2009)................................................ 22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    591 U.S. 732 (2020) ...................................................................... 4, 5

*Paul v. Watchtower Bible and Tract Society of New York, Inc.,*
    819 F.2d 875 (9th Cir. 1987) ............................................................ 16

*Pisani v. Staten Island Univ. Hosp.,*
    440 F. Supp.2d 168 (E.D.N.Y. 2006)....................................................29

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
    772 F.2d 1164 (4th Cir. 1985)...............................................................7

*Rweyemamu v. Cote,*
    520 F.3d 198 (2d Cir. 2008) ............................................................5, 6

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ...........................................................................11

*Tandon v. Newsom,*
    593 U.S. 61 (2021) .......................................................................17, 18

*We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.,*
    76 F.4th 130 (2d Cir. 2023) ................................................................18

## **INTRODUCTION**

Respondents' opposition reads as if this Court's prior decision in this case—*Belya v. Hilarion*, 45 F.4th 574 (2d Cir. 2022)—does not exist. Respondents repackage the same arguments that *Belya* had already rejected, insisting that the First Amendment wholly immunizes their conduct from scrutiny. Each of their assertions ignores this Court's explicit holdings.

At the heart of Respondents' argument is a fundamental mischaracterization of the core issue. This case does not ask the court to decide who should be a bishop, or whether he could be disciplined or defrocked, but whether Respondents defamed a priest by accusing him of criminal forgery. That accusation was broadcast to millions, indeed, billions, online readers. Respondents' spin of this case as a dispute over internal ecclesiastical process not only ignores the *Belya* decision, but collapses under the evidence.

Respondents misstate what entanglement means. Determining whether signatures were forged, and whether Respondents knew the truth, is a secular question of fact, resolved every day through neutral evidentiary means—handwriting experts, document examination, and witness testimony. As this Court has already made clear, such questions are "decidedly non-ecclesiastical." 45 F.4th at 582. Respondents' argument that any inquiry into their actions and motives would impermissibly probe religious judgment confuses doctrine with deceit.

Respondents' invocations of the Free Exercise Clause and the ministerial exception bear no resemblance to the circumstances of this case. Those doctrines protect religious decision-making, not defamatory speech. No First Amendment principle permits clergy to defame a fellow priest to the public and then claim immunity.

In short, Respondents' opposition recycles arguments this Court has already rejected and misstates both the record and the law. Their position would transform a narrow constitutional defense into an unlimited license for defamation. The First Amendment provides no such shelter.

Further, Respondent's opposition does nothing to rebut Belya's arguments concerning the matters which the district court *actually addressed*, and on which the dismissal of Belya's case was based: the district court's misapplication of the so-called "single publication rule;" the erroneous conclusion that the defamatory statement is "subsidiary" to clams on which there can be no recovery; and the erroneous finding that the determination of whether the defamatory statement was "substantially true," and proof of Belya's damages, raises First Amendment concerns. The judgment should be reversed.

## ARGUMENT

### I. The First Amendment does not bar Belya's claims

From the time of the filing of the complaint and throughout extensive discovery Belya has scrupulously maintained strict boundaries between secular and ecclesiastical matters, steering clear of the former and focusing solely on the latter. Belya's lawsuit does not, and never has, involved any ecclesiastical issues. This is a suit for defamation, revolving around the baseless claim, published to the world, that Belya had forged and fabricated three letters, according to the secular meanings of those terms.

Every step of the way, defendants have endeavored to muddy the waters, arguing that various religious questions are at issue. Throughout the litigation, defendants have claimed that Belya is really challenging his election as bishop, his defrockment, internal church discipline, and myriad other religious matters. Of course, as this Court has already held, none of these religious issues bear any relevance to Belya's defamation claims. As the district court stated, "[t]he Second Circuit didn't accept defendants' sweeping interpretation of the First Amendment when it heard their appeal." SPA 1583. But the reality of Belya's suit doesn't help defendants shirk liability for their smear campaign, and so they persist with their sweeping interpretation of the First Amendment, supported by a slew of mischaracterizations of Belya's claim.

This Court should once again reject defendants' attempt to inject religious issues into Belya's secular suit. First, Belya's claims have nothing to do with church employment decisions or discipline, and therefore the ministerial exception is inapplicable. Second, ecclesiastical abstention is inappropriate in this case because there is no need to intervene in doctrinal debates or to answer any religious questions. Third, there is no risk of entanglement because there are no religious controversies at stake. Fourth, and finally, defendants' Free Exercise rights are not violated by defamation liability because defendants do not claim any religious motivation for defaming Belya, and defamation law easily satisfies the rational basis review to which it is subject.

## A. The ministerial exception does not bar Belya's claims

The ministerial exception is a limited departure from the constitutional rule that religious organizations are bound by laws that are neutral with respect to religion and apply generally. *See, Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). Because "religious institutions" do not "enjoy a general immunity from secular laws," the exception is narrow: It protects "internal management decisions" regarding the selection of important teachers and preachers of the faith. *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, 746 (2020). Applications of the exception must be "tailored to this purpose." *Hosanna-Tabor,* 565 U.S. at 199 (Alito, J., concurring).

With only one exception,[1] the Supreme Court and this Court have only ever applied the exception to employment-discrimination claims. *See Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 206 (2d Cir. 2017) (applying ministerial exception to employment-discrimination claims); *Hosanna-Tabor,* 565 U.S. at 188 (same); *Morrissey-Berru,* 591 U.S. at 738 (same); *Rweyemamu v. Cote,* 520 F.3d 198, 209-10 (2d Cir. 2008) (same). That is because applying antidiscrimination laws to ministers—employees who are "essential to the performance" of religious functions, *Hosanna-Tabor,* 565 U.S. at 199 (Alito, *J.,* concurring)—would gravely intrude on a religious group's freedom to "shape its own faith and mission," id. at 188 (majority op.).

Where courts have held that the ministerial exception does bar some tort claims, it was because the claims at issue would similarly intrude on religious entities' ability to select ministerial employees. So, for example, courts have barred tort claims that challenge a church's "internal disciplinary proceedings," *Ogle v. Church of God*, 153 F. App'x 371, 376 (6th Cir. 2005), or that are "really seeking civil court review of" a church's employment decisions, *Hutchinson v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986); *see also Kraft v. Rector, Church Wardens & Vestrymen of Grace Church in New York*, 2004 WL 540327, at *5 (S.D.N.Y. Mar.

---

[1] *See Friedlander v. Port Jewish Ctr.*, 347 F. App'x 654, 655 (2d Cir. 2009) (unpublished decision holding that ministerial exception barred rabbi's breach-of-contract claim arising from temple's decision to terminate her employment).

17, 2004) (dismissing tort claim "disputing the reasons why a church decided to terminate a minister"). But no intrusion on internal disciplinary and employment matters occurs when a plaintiff "'alleg[es] particular wrongs by the church that are wholly non-religious in nature'—including, for example, certain common-law tort claims." *Fratello,* 863 F.3d at 202 (quoting *Rweyemamu*, 520 F.3d at 208).

The ministerial exception is not applicable here. Belya does not accuse the church of employment discrimination—his claims are for defamation. And, even if some defamation claims are barred by the ministerial exception, Belya's claims are not. Belya does not seek civil court review of church employment decisions.

As they had on the summary judgment motion, defendants repeatedly mischaracterize the nature of Belya's claims, asserting, without basis, that Belya is asking the court to second-guess religious decisions reached by the ROCOR Synod and claiming that adjudicating his claims requires the court to interfere in supervision of clergy and management of matters of internal church polity. None of this is true. Whether, for example, Belya was validly elected as Bishop has no relevance to his defamation claims. SPA 832-833, ¶ 74 ("I am not asking the Court to make any ruling on whether or not I was elected Bishop."). The fact that the September 3 Letter contains statements of ecclesiastical nature which are outside the purview of the court does not—and should not—immunize the defendants from including in it one decidedly non-ecclesiastical accusation: that Belya was a forger

of official letters and a fabricator of their contents. The trier of fact need not decide whether Belya had been elected Bishop – all the trier of fact needs to decide is whether Belya had fabricated that he had been elected.  Similarly, the trier of fact need not decide whether the accusations of doctrinal improprieties on Belya's part are true. These have nothing to do with whether he had been falsely accused of being a forger. Belya does not contend that ROCOR's was not entitled to "investigate" and "discipline" him, or that the defendants were entitled to dismiss him. What defendants were not entitled to do, however, was publicly proclaim the falsehood that Belya is a forger. *Cf. Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("[C]hurches are not—and should not be—above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts.").

Defendants repeat, mantra-like, that Belya was subject to being "disciplined" by ROCOR and that the September 3 letter was a "disciplinary" letter and therefore immune from being questioned in court. How is a false accusation of forgery a plausibly "disciplinary" act? Defendants' rationale, logically extended, would apply to a false accusation of murder, from which defendants would be immunized if only they included it among other—"doctrinal"—accusations.

Defendants posit that allowing Belya to proceed with his claim would cause clergy to "feel pressure" of a lawsuit every time they send an email. But clergy do not get dispensation from having to abide by the laws which apply to the rest of us.

Defendants claim that "determining malice or negligence" on defendants' part would require an "explanation for ministerial choices." Not at all. To begin with, discovery conclusively established that the letters which Belya was accused of forging are in fact genuine. None of the defendants denied the genuineness of Met. Hilarion's signature and seal on his letters. SPA 1201-1210 (¶¶ 1-40); 1221-1222 (¶¶ 91- 99). Some of the defendants flat-out admitted that the signatures were genuine. SPA 1201-1210 (¶¶ 4, 11, 14, 16, 18, 34, 38). Others testified that at the time they had signed the September 3 letter, they had not even seen the letters which Belya was accused of forging and fabricating. *Id*. (¶¶ 3, 5, 13, 20, 33, 35, 39). What possible "ministerial choices" would necessarily need to be discussed in court for the jury to conclude that in falsely accusing Belya of forgery, the defendants had acted negligently or with legal malice? Defendants don't explain this in their brief, they merely assert it. Furthermore, the court can always preclude a question to a witness which it believes raises a potentially religious issue.

The ministerial exception does not bar Belya's claims for damages. The ministerial exception only bars remedies that "implicate…protected ministerial decisions." *Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 966 (9th Cir. 2004).

So, for example, a plaintiff cannot recover for the "lost or reduced pay" or "emotional distress or reputational damages" suffered as a result of employment decisions protected by the ministerial exception. *Id.* at 966; *see also Hosanna-Tabor*, 565 U.S. at 194 (damages for discriminatory firing "would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination."). A damages claim requiring the court to weigh the reasons for a church's decision to fire a minister would likewise be barred because it "would necessarily snare the trial court in matters involving the discipline and dismissal of a religious leader." *Episcopal Diocese of S. Va. v. Marshall,* 903 S.E.2d 534, 544 (Va. Ct. App. 2023). But a plaintiff can recover damages caused by conduct "the ministerial exception does not protect" and that do not hinge on the reasons for that protected conduct. *Elvig,* 375 F.3d at 966.

Here, the ministerial exception does not bar Belya's damages claims. The underlying conduct—a defamation claim that in no way impinges on the church's ability to choose its ministers—is not protected. And evaluation of damages would not "snare the trial court in matters involving the discipline and dismissal of a religious leader," *Marshall,* 903 S.E.2d at 544, as Belya's claims for damages do not turn on the reasons for the church's employment decisions. Rather, the church's reasons for its employment decisions are wholly irrelevant.

Defendants assert that in determining damages, the jury would need to consider "religious factors" that defendants say contributed to Belya's lost standing in the community. But defendants cite no authority for the extraordinary argument that a possible religious justification for a community member's actions somehow violates the church's First Amendment rights. Nor could they—the ministerial exception is concerned with protecting religious employers' employment decisions. The exception has no bearing on the non-employment-related decisions of non-employer community members. Belya's damages claims therefore do not implicate the ministerial exception.

## B. The ecclesiastical abstention doctrine does not bar Belya's claims

The ecclesiastical abstention doctrine protects religious institutions' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). But "[s]imply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case." *Belya*, 45 F.4th at 630. "[C]ourts may apply 'neutral principles of law' for the resolution of disputes involving religious matters, so long as the 'neutral principles' allow the court to avoid deciding questions of religious doctrine, polity, and practice." *Moon v. Moon*, 833 F. App'x 876, 879 (2d Cir. 2020).

So, for example, a court cannot decide whether church doctrine requires the defrocking of a bishop. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 718 (1976). Nor may a court determine which ecclesiastical authority controls a church, *Kedroff,* 344 U.S. at 119, or whether someone is a nun, *McCarthy v. Fuller*, 714 F.3d 971, 979 (7th Cir. 2013). But the prohibition against courts making religious decisions does not preclude adjudication of claims over a religious entity's or its members' secular actions, *Bryce v. Episcopal Church,* 289 F.3d 648, 657 (10th Cir. 2002), or of secular disputes between religious parties, *see DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 169-70 (2d Cir. 1993).

Courts thus routinely evaluate tort claims against religious entities where the claims can be decided under neutral principles. *See, e.g., Moon,* 833 F. App'x at 880 (declining to dismiss claim for violation of whistleblower protection statute on ecclesiastical abstention grounds because the claim "can be evaluated without reference to any religious doctrine"); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.,* 966 F.3d 346, 349 (5th Cir. 2020) (allowing defamation claim against religious employer to proceed because plaintiff "is not challenging the termination of his employment" and "is not asking the court to weigh in on issues of faith or doctrine"); *Ogle v. Hocker,* 279 F. App'x 391, 396 (6th Cir. 2008) (allowing pastor's defamation claim against church because allegedly defamatory statements were not part of a sermon, no doctrinal issues were involved, and the defendant did

"not claim that defamation is a practice of his church or is otherwise rooted in religious belief"); *Drevlow v. Lutheran Church, Mo. Synod,* 991 F.2d 468, 471 (8th Cir. 1993) (reversing dismissal of minister's tort claims, which required proving that "false information kept him from obtaining employment as a pastor," because the claims could be adjudicated without "an impermissible inquiry into the Synod's bylaws or religious beliefs").

Here, too, as this Court has already recognized, *see Belya*, 45 F.4th at 634, Belya's defamation claim can be resolved by reference to neutral principles of law and without "deciding questions of religious doctrine, polity, and practice," *Moon*, 833 F. App'x at 879. Belya claims that, in their September 3 Letter, defendants falsely and defamatorily stated that Belya forged, falsified, and transmitted three letters. Belya's' defamation claims depend on "[d]ecidedly non-ecclesiastical questions of fact[,]" namely: "[D]id the purported signatories actually sign the letters? Were the December 10 and January 11 letters stamped with Metropolitan Hilarion's seal? If so, who stamped them? Was the early January letter on Archbishop Gavriil's letterhead? More broadly, did Belya forge the letters at issue?" *Belya*, 45 F.4th at 634. These are secular questions suitable for adjudication according to neutral principles.

Defendants repeatedly attempt to inject religious issues into the case. But none of the religious issues raised by defendants are material to Belya's claims. For

example, defendants' assertion that adjudicating Belya's defamation claims would interfere with internal church disciplinary proceedings is incorrect. The defamatory content was shared not only internally, with clergy and church members, but also publicly and massively online.

Moreover, Belya's claims do not require the Court to intervene in church disciplinary matters. Belya does not challenge his expulsion from the Church. *Compare* with, *e.g., C.L. Westbrook, Jr. v. Penley,* 231 S.W.3d 389, 399-400 (Tex. 2007). He does not ask the court to opine on his fitness to be a minister or his adherence to ecclesiastical standards. *Compare* with, *e.g., Dermody v. Presbyterian Church (U.S.A.),* 530 S.W.3d 467, 474 (Ky. Ct. App. 2017). And Belya's claims are not based on doctrinal disagreements, internal or otherwise. *Compare* with, *e.g., Bryce, supra,* 289 F.3d at 658; *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 254 (S.D.N.Y. 2014). The central questions here are purely secular: whether Belya forged the letters, and whether defendants knew their accusation of forgery was false when they announced it to the world.

Defendants complain about the requests for information and deposition questions posed by counsel during discovery. But none of the examples proffered by defendants change the secular nature of Belya's claims. For example, defendants point out that Belya's counsel requested documents pertaining to defendants' position that Belya's election as Bishop never took place and that there were

13

irregularities in the three letters. Neither of those requests impermissibly veered into topics made off-limits by the ecclesiastical abstention doctrine; they simply sought to clarify the basis—or lack thereof—for defendants' accusations against Belya. *See, Martinelli v. Bridgeport Roman Cath. Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir. 1999) (explaining that factfinders may take religious principles into account if they are accepted as facts, so long as they do not evaluate the truth or falsity of those principles). Similarly, questions about the relationship of ROCOR with the Russian Church in Moscow did not interfere with, or question the validity of, church policies. Even if any discovery went too far, that would be a reason to, come trial, preclude certain evidence. It is not a reason to dismiss the case before the evidence was sought to be introduced.

Also, defendants had heavily redacted the documents they produced. SPA 875-876, ¶¶ 33-36. They withheld and redacted documents based on assertions of "First Amendment privilege," "Internal church communications concerning church governance," "Church autonomy doctrine," and "Ministerial Exception." *Id.* Belya's counsel did not challenge these redactions and withholdings. *Id.* ¶ 38. He fully accepted them. In the course of the defendants' depositions, defendants' counsel made a number of objections based on church governance and First Amendment privilege, and instructed his clients not to answer. *Id.* ¶ 39. Belya's counsel never challenged any of counsel's objections. *Id.* ¶¶ 40-42. Moreover, defendants never

sought a confidentiality order, or attorneys' eyes only order, either for documents or deposition testimony. *Id.* ¶¶ 43-44. Belya's counsel would have stipulated to one had they asked. *Id.*

Defendants' assert that the genuineness of the three letters can only be determined with reference to "Church law and custom" regarding the election of bishops. That is untrue. As already explained, whether Belya's election was valid according to church law and custom is irrelevant—even if the election was invalid, or had never taken place, that would not mean Belya had forged the letters. And there is plenty of secular evidence in the record demonstrating that, in fact, Belya did not forge the letters.  It is indeed a conceded fact. *See, e.g.,* SPA 1201-1211, ¶¶ 1-45. There is also ample evidence that defendants knew this when they maligned him as a forger.

Belya's claims are that he was wrongly, and publicly, denounced for forging, falsifying, and transmitting letters according to the ordinary, secular definitions of those terms. A factfinder can evaluate these claims under neutral principles.

### C. The Establishment and Free Exercise Clauses do not bar Belya's claims

Ecclesiastical abstention and the ministerial exception, both derived from the Establishment and Free Exercise Clauses, are the principles that restrict governmental interference in ecclesiastical matters. *See Hosanna-Tabor,* 565 U.S.

at 181. There is no separate principle under either clause creating further restrictions. The entanglement principle is not a separate restriction from the ecclesiastical abstention doctrine in this context, and even if it was, there is no improper entanglement. Likewise, there is no separate violation of the Free Exercise Clause.

First, for the same reasons outlined above, Belya's claims do not cause any impermissible entanglement in religious controversies. Indeed, there is no religious controversy at issue. Belya does not challenge the authority of the church over ecclesiastical matters, *see Milivojevich,* 426 U.S. at 709; church law and doctrine is irrelevant, *see Kavanagh,* 997 F. Supp. 2d at 254; and defendants do not assert that they were religiously mandated to defame Belya, *NLRB v. Cath. Bishop,* 440 U.S. 490, 502 (1979). There is no risk of entanglement in this case, and the Establishment Clause therefore does not bar Belya's claims.

Second, the Free Exercise Clause does not proscribe Belya's claims. Defendants claim that defamation law directly burdens their free exercise rights. But defamation law does not impose any burden on defendants' religious exercise. Defendants cite *Paul v. Watchtower Bible and Tract Society of New York, Inc.,* 819 F.2d 875, 880 (9th Cir. 1987), which held that a church could not be held liable in tort for "shunning" a former member. *Paul*, however, is easily distinguishable. In that case, the Court explained that "shunning is an actual practice of the Church itself" and "[i]mposing tort liability for shunning on the Church or its members

would [therefore] have the same effect as prohibiting the practice and would compel the Church to abandon part of its religious teachings." *Id.* at 881. In other words, imposing tort liability for shunning would directly punish religiously motivated conduct. *See id*. Here, by contrast, defendants do not claim to have been motivated by any religious purpose in charging Belya with forgery, nor reasonably could they. Imposing liability for defendants' defamation would not directly, or indirectly, burden their religious exercise.

Defendants further argue that defamation law is not generally applicable and therefore is subject to strict scrutiny. Defendants are wrong on this point, too. General applicability is the requirement that the "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 543 (1993). Government thus may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying governmental interests. *See Tandon v. Newsom,* 593 U.S. 61, 62 (2021) (per curiam). Nor may the government utilize a "formal system of entirely discretionary" and "individualized" exemptions to favor requests for secular exceptions over religious ones. *Fulton v. City of Philadelphia,* 593 U.S. 522, 533, 536 (2021).

Defamation law is generally applicable. Defamation law does not treat nonreligious defamation more favorably than religious defamation, and there is no system of exemptions from defamation liability that favors secular exemptions over religious ones. Defendants point out that "defamation law exempts or applies different legal standards for…speech concerning public figures or privileged communications," but neither of those examples show any favor toward secular conduct. For one thing, any speech (religious or not) concerning any public figure (religious or not) would be subject to a higher standard of proof to establish defamation. Defendants also present no evidence that the law's protection for privileged communications operates to favor secular communications over religious ones.[2]

Defamation law is therefore subject only to rational basis review, *see We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.,* 76 F.4th 130, 156 (2d Cir. 2023), which it easily survives. The law of defamation is rationally related to the "legitimate state interest…[of] compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341 (1974). Defendants' Free Exercise claim therefore fails.

---

[2] Overall, there is no precedent for applying *Lukumi*, *Tandon*, or *Fulton* to a set of common-law or judge-made legal principles. Under defendants' view of the law, any time common-law principles in a case created different legal standards for different types of situations, that would result in strict scrutiny. That would open a wide variety of legal regimes to claims for religious exemptions, resulting in chaos.

The district court held that "to get at what Metropolitan knew and when" defendants would be required to testify about "the proper election of ROCOR bishops," "what was said among senior church leaders about church disciplinary procedures," and "communications among senior clergy about internal church governance." This was error. None of this testimony would be required. Belya's case is at bottom very simple: all Belya needs to prove is that the accusation of forgery in the September 3 letter was false, that it was published by defendants, and that he was damaged as a result of it. The falsity has already been established by uncontested expert testimony and admitted by most of the defendants. What possible testimony about "church disciplinary procedures" or "internal church governance" would be called upon at trial? Unless the defendants took the position that church doctrine *required* them to falsely accuse Belya of an unlawful act (which they certainly do not claim), there would be no reason for testimony to veer off into disciplinary procedures or church governance. There certainly may be testimony concerning the communications among the defendants specifically about the accusations of forgery—who was told what about the genuineness or un-genuineness of the signatures and the seal—but that would not be a doctrinal matter at all. It would go to straightforward neutral facts. In any case, the district court would be overseeing all such testimony and would be able to block any questions that risked crossing impermissibly into doctrinal territory. But to assume that Belya's claims

19

could not be tried without necessarily breaching that line is speculative at best, and was error on the part of the district court.

Defendants give (p. 36) a laundry list of what they claim to be religious issues that would need to be presented to the jury on the issue of publication. None of these are required in the slightest to determine publication of the charge of forgery. The publication was done by defendants through direct Facebook posts and through Olga Tsibin. The Tsibin story, set out in detail in the Appellate Brief, does not touch upon any religious matters. It is based entirely on neutral facts. Whatever arguments defendants may have for why they should not be deemed to have "published" the defamatory statements would be of an entirely secular and neutral nature. It only becomes a religious issue if the Court accepts defendants' untenable position—one already rejected by this Court—that the false charge of forgery was part and parcel of a "disciplinary" procedure and is therefore immune from adjudication in court. And, again, the district court, in exercising its gatekeeping function, would always be able to filter out any questions that might touch upon religious doctrine or church functions.

Defendants further claim (p. 43) that the jury would not be able to separate damages caused to Belya by the charge of forgery from the damages he may have sustained as a result of other charges in the September 3 letter, ones predicated on religious doctrine and which are not a subject of this lawsuit. Therefore, defendants'

argument goes, the jury would necessarily need to delve into religious matters. This is incorrect.

Belya's damages are proven through his expert on online defamation, who analyzes harm to Belya *specifically and solely* stemming from the dissemination of the false charge of forgery, nothing else. SPA 1050-1115. This is made abundantly clear in the expert report, as shown in Belya's opening brief.  Belya's expert concludes that approximately 866 thousand people had been exposed *specifically to the charge of forgery* against Belya, and he further estimates a total of almost three billion web "impressions," again, specifically of the forgery charge. SPA 1110-1112. The expert's estimated damages to the Belya are based, in part, on the cost of online rehabilitation of Belya's reputation from the false charge of forgery, *not anything else*. SPA 1086-1093. Defendants' claim that the jury would need to segregate forgery-based damages from other accusations is nonsensical: there are no other damages to consider, as none are part of the case. Defendants' counsel would certainly be free to examine Belya's expert on whether his opinion takes into account other reputational damages that Belya may have suffered, ones, for example, stemming from "religious" accusations in the September 3 letter. Indeed, counsel has already explored this issue at deposition. But it is difficult to imagine how such an examination would violate the defendants' religious protections. Defendants themselves have retained a damages expert, whose report and testimony likewise do

not touch on any doctrinal issues. The point is, proof of damages, and any rebuttal to it, would be presented to the jury trough experts in the field of online reputation, a strictly non-religious field, and there is simply no room for injecting into their testimony any issue that could plausibly violate defendants' First Amendment protections.

## II.    The September 3 Letter is not a privileged communication

Defendants assert that Belya would necessarily need to delve into religious issues to prove that the defendants had acted with malice.  Not so.

In the context of a defamation claim qualified privilege "may be overcome by a showing of 'actual malice' (*i.e.*, knowledge of the statement's falsity or reckless disregard as to whether it was false) or common law malice." *Chandok v. Klessig,* 632 F.3d 803, 815 (2d Cir. 2011). *See also Orenstein v. Figel,* 677 F. Supp.2d 706, 710 (S.D.N.Y. 2009) (malice in the context of qualified privilege encompasses "knowing or reckless disregard of a statement's falsity"). The record is replete with evidence of reckless disregard.

None of the defendants denied at their depositions that the signatures of Met. Hilarion were genuine. SPA 1201-1237,  ¶¶ 1-40, 91-99. Some admitted it outright. *Id.* ¶¶ 4, 11, 14, 16, 18, 34, 38. Some had not even seen Met. Hilarion's letters at the time when they signed the September 3 letter. *Id.* ¶¶ 3, 5, 13, 20, 33, 35, 39. This notwithstanding, defendants went ahead and signed and issued the letter anyway.

A complete draft of the September 3 letter was written within hours of the August 30 announcement. SPA 1201-1237, ¶¶ 152-155. This, while Met. Hilarion himself was extending his congratulations and "Praise the Lord" on the August 30 announcement.[3] *Id.* ¶ 135. The day before the September 3 meeting at which the letter was signed, Gan wrote to Olkhovsky: "Maybe good to send the EAD council's decision and the 'forged' letters in one chunk right before the call." SPA 936. The "forged" letters, however, were not sent to the council, since a number of the signers had not seen them before signing the September 3 letter. Defendant Gan was referring in his email to "forged" letters even though he himself testified that the signatures "looks like" Met. Hilarion's and that he did "not know whether he signed it or not." A day after the letter was signed, Olkhovsky, responding to the unpleasant (to him) news from Antchoutine that Belya could prove the genuineness of the signatures through forensic analysis, speculated that even if the letters had been signed by Met. Hilarion, he "could have been pressured into signing" them. SPA 933-935. The obvious inconsistency between saying that Met. Hilarion "knew nothing" about the letters and saying that he was "pressured" into signing these same

---

[3]  "Praise the Lord" and "congratulations" are not a natural reaction of a man who has just learned that fabricated and forged letters he knew nothing of were sent to Patr. Kirill.  It is, however, a natural reaction of someone who had for over a year been working deliberately and diligently towards that very goal. Defendants' argument that interpreting these words would require delving into religious doctrine is, to be generous, untenable.

letters speaks volumes to defendants' malice. The record is devoid of any evidence of "pressure."

Further, qualified privilege does not apply if "defendant abused the privilege by acting beyond the scope of the privilege," which occurs when "the defendant does not exercise the privilege in a reasonable manner [or] abuses the occasion." *Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 410 (2d Cir. 2000). The defendants' dissemination of the letter went far beyond anything that could be deemed reasonable. The publication of the charge of forgery was not limited to the Synod. The people who distributed leaflets in Belya's church were not ROCOR clergy. SPA 1201-1237, ¶¶ 138, 146, 147. Neither were the numerous callers who accused Belya of forgery. *Id.* ¶ 147. Defendants then promptly leaked the letter online through Olga Tsibin, most certainly not a member of the clergy. *Id.* ¶¶ 123-125, 148. Defendants Gan, Lukianov and Antchoutine posted the forgery charge on their Facebook pages. *Id.* ¶¶ 163, 164, 168. This is not a "reasonable manner" of exercising the privilege. Moreover, by accusing Belya of fabricating and forging documents which defendants knew had not been forged – and in some cases had not even seen – defendants "abused the occasion."

The defendants' argument that in proving malice Belya would inevitably cross into areas of church doctrine is untenable. The above facts are neutral, and, once proven, would be amply sufficient for the jury to find that defendants had acted with

requisite malice. Any unintended veering into impermissible religious areas would be blocked by the court at trial.

## III.  Belya can prove actionable publication

As shown in the Appellate Brief, publication of the charge of forgery was a multi-step process designed for maximum online exposure. It was published in several stages, first by delivery to the members of ROCOR Synod, then through Facebook posts by Olga Tsibin, then, in sequence, through Facebook posts by defendants Gan, Lukianov and Antchoutine.

Defendants argue (p. 53) that Belya has "no evidence that defendants sent the letter to anyone." On the contrary, as set forth in the Appellate Brief, there is ample circumstantial evidence, from which a jury could ascertain a direct and intended path of the letter from the defendants to Tsibin, and find that the only logical and reasonable conclusion is that defendants had used Tsibin to disseminate the letter online. The events that preceded the letter, the relationship between Tsibin's former and current husbands to the defendants, the prior clandestine use by defendants of Tsibin's husbands to dig up dirt on Belya, the timing of Tsibin's posts, the fact that she re-posted the letter under a fictitious name, all considered in the light of the defendants' certain knowledge that the charge of forgery was false, and their concern, as expressed in their own emails, that Belya could prove the genuineness of the signature, is, collectively, ample circumstantial evidence for the jury to find

that defendants had used Tsibin to spill the letter online and let it mass-disseminate from there.

Defendants next argue that Antchoutine's and Lukianov's posts were not specifically mentioned in the complaint and therefore cannot be considered by the court. This is a novel argument, never before raised by defendants, including on summary judgment. It is wrong. The complaint pleads publication of the defamatory statement by each defendant. It was in the course of discovery that the specific Facebook posts by Antchoutine and Lukianov came to light. They were thoroughly explored at their depositions.

Defendants' argument concerning hyperlinks (p. 54) ignores Belya's explanation in the Appellate Brief of the inapplicability of the hyperlink rule to this case: "a new cause of action accrues upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition." *Lehman v. Fox Cable Networks Inc*., 2009 WL 2707391, *5 (E.D.N.Y., Aug. 25, 2009). The factors considered are "(1) whether the subsequent publication is intended to and actually reaches a new audience; (2) whether the second publication is made on an occasion distinct from the initial one; (3) whether the republished statement has been modified in form or in content; and (4) whether the defendant has control over the decision to republish." *Fisher v. Forrest*, 2017 WL 128705 *14 (S.D.N.Y., Jan 13, 2017). As explained in the Appellate Brief,

Gan's, Lukianov's and Antchoutine's posts fall squarely within the exception. They are not "republications" at all, but actual original publications by defendants' own false change of forgery, laundered through another post by a third party. That is, the defendants were "republishing" *their own* defamatory statements. None of this is addressed by defendants in their brief.

## IV.   **Belya can prove damages**

Defendants misstate Belya's claimed damages. Belya does not claim damages for the loss of parishioners in his church or income stemming from the loss of the parishioners. That category of damages had been withdrawn. SPA 878, ¶46. Defendants know this well, yet they persist in misstating the record.

The specific categories of damages claimed by Belya include: "injury to Belya's reputation, including … [the] cost of reputational repair;" "humiliation and mental anguish;" "injury to Belya's health, shame, and hurt feelings;" and "punitive damages." SPA 879-883. All of these can be properly considered and compensated by the jury. *See*, *Carroll v. Trump*, 683 F. Supp.3d 302, 319-323, 328-334 (S.D.N.Y. 2023). *See also Carroll v. Trump*, 2024 WL 1786366 (S.D.N.Y., Apr. 25, 2024).

Belya's damages are supported by two expert reports, including of a psychiatrist, who opines on the emotional and psychological effect on Belya of being accused of forgery; and an expert on online defamation, who opines, inter alia,

concerning the cost of reputational repair stemming from the false charge of forgery. Belya's damages are well supported by the record.

The only part of the district court's decision that deals with the issue of damages is that their assessment would raise First Amendment concern. This is fully addressed in the Appellate Brief, as well as reiterated above. The district court did not find that Belya's damages are in any way inadequate under the principles of defamation law. Rather the district court stated that its decision on summary judgment rendered moot the two pending *Daubert* motions concerning the admissibility of Belya's expert testimony, including of the damages expert.

## V.    The defamatory statement is of and concerning Belya and is not "true"

On the question of "is and of concerning," the district court stated as follows:

> defendants try to evade the reasonable meaning of the defamatory statement by claiming it merely discusses irregularities, not forgery. … The most obvious implication of this revelation is that the letters were somehow faked. Stopping short to conclude that the September 3 letter is about "irregularit[ies]" alone ignores context, exactly what the Second Circuit and New York Court of Appeals have told courts to avoid.

SPA 1577. Defendants challenge this conclusion, claiming, in effect, that while the letter may have referred to forgery, it did not refer to forgery specifically by Belya, as opposed to someone else, like, for example, his brother Ivan. The argument is beyond meritless. The district court got this point right. When Gan, Antchoutine and

Lukianov posted on Facebook that Belya had forged the letters, they were referring to the plaintiff, not his brother or anyone else.

"The 'of and concerning' requirement is generally an issue of fact which the jury alone may decide." *Pisani v. Staten Island Univ. Hosp.,* 440 F. Supp.2d 168, 172 (E.D.N.Y. 2006). Only where the statements "are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff" can the issue be decided summarily. *Id.* "In determining whether the 'of and concerning' requirement has been sufficiently pleaded, the Court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement." *Id.*

There is only reasonable interpretation of the statement here, one that is proven by the massive record of online dissemination: that Belya, *not someone else*, had fabricated the letters and forged the signatures, or had them forged. The almost three billion web "impressions" of the forgery charge accumulated over the past five years – including those generated by defendants themselves – all "concern" Belya the Plaintiff, not some other unidentified forger.

Defendants argue that the statement is "true" because dictionary definition of forgery includes "without appropriate authorization." "A defamatory statement is one that is reasonably susceptible to a defamatory connotation in context." *A & E Products Group L.P. v. The Accessory Corp.,* 2001 WL 1568238 * 6 (S.D.N.Y.

2001). "The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." *Flamm v. Am. Ass'n of Univ. Women,* 201 F.3d 144, 146-48 (2d Cir. 2000). "Courts should not "strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous." *November v. Time Inc.,* 13 N.Y.2d 175, 194 N.E.2d 126, 128 (N.Y. 1963).

The record fully supports a finding that the defamatory statement is reasonably susceptible to the connotation that the Belya is a forger and fabricator—and that the defendants had intended the letter to be so understood. This was the very point of the September 3 letter, and it was so "read and understood" by the publications who carried the story, their readers, posters and re-posters.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed.

Respectfully submitted,

/s/ *Oleg Rivkin*
Oleg Rivkin (OR1331)
RIVKIN LAW GROUP PLLC
*Counsel for Appellant*
48 Wall Street, Suite 1100
New York, New York 10005
201-362-4100
or@rivkinlawgroup.com

October 30, 2025

## CERTIFICATE OF COMPLIANCE

**Word Count.** This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 6,997 words.

**Typeface/Type-style.** This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word in Times New Roman, a proportionally spaced font, in a size equal to 14 points or larger.

Date: October 30, 2025        <u>/s/ Oleg Rivkin</u>